**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**PARISH OF ST. BERNARD, Police Jury of the Parish of St. Bernard, Lake Borgne Basin Levee District, Fosco Enterprises, Inc., Travelers Insurance Co., Parish of Jefferson and Jefferson Parish Council, Regent Development Corp., Jefferson Levee District, Pontchatrain Levee District, Joseph F. Varisco, Jr., and Terry Tedesco, Inc., J.J. Krebs and Sons, Inc., Defendants-Appellees.**

**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**The PARISH OF JEFFERSON, et al., Defendants-Appellants.**

**Nos. 83–3557, 83–3760 and 84–3082.**

United States Court of Appeals, Fifth Circuit.

April 8, 1985.

Jerre S. Williams, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Raymond Childress, Henry J. Miltenberger, Jr., Fritz B. Ziegler, Covington, La., for Lake Borgne Basin Levee Dist.

A. Scott Tillery, Chalmette, La., for Fosco Enterprises, Inc.

John J. Weigel, New Orleans, La., for Fosco Enterprises, Inc. & Travelers Ins. Co.

Ivy A. Smith, Jr., Joseph H. Hurndon, New Orleans, La., for Tedesco, Inc.

Gerald M. Dillon, New Orleans, La., Hubert A. Vondenstein, Gretna, La., for Jefferson Parish & Council.

Rene A. Pastorek, Gretna, La., for Regent Development Corp.

Bruce G. Reed, New Orleans, La., for Jefferson Levee Dist.

John I. Hulse, IV, Kenneth V. Faherty, New Orleans, La., for J.F. Varisco.

Leonard Schaitman, Mark H. Gallant, Michael F. Hertz, Appellate Staff, Civ. Div., Justice Dept., Washington, D.C., for U.S.A.

Stanley E. Loeb, New Orleans, La., for Fireman's Fund Ins. Co.

Phelps, Dunbar, Marks, Claverie & Sims, Harry A. Rosenberg, New Orleans, La., for U.S. Home, Inc., HomeCraft, Inc.

Donald Hammett, Kevin O'Bryon, New Orleans, La., for defendants-appellants Jefferson Parish, et al.

Adam & Reese, Sam A. LeBlanc, III, Rebecca A. Bush, H. Bruce Shreves, Dillon & Cambre, Gerard M. Dillon, New Orleans, La., Hubert A. Vondenstein, Gretna, La., for St. Bernard Parish and The Policy Jury of St. Bernard Parish.

Charles F. Seemann, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for Burke & Assoc.

Before BROWN, WILLIAMS, and GARWOOD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

## I. Overview

In this exceptionally complicated consolidated action we are presented with what is apparently a question of first impression under the National Flood Insurance Program (NFIP). The United States Government seeks recovery of over $100 million from various Louisiana public and private defendants. The district judge granted the defendants' motions for summary judgment on several of the government's claims. After various procedural maneuvers, both sides sought, and we granted, an interlocutory appeal to resolve the correctness of the district court's summary disposition.

After briefing, an extended oral argument, and a diligent search of the record, we affirm the district court's opinion dismissing the United States' express contractual claim. Since the government abandoned its public nuisance claim on appeal,

its dismissal is not before us. We further hold that no implied right of action is available to the United States under the NFIP. We also find that injunctive relief would be ineffectual and accordingly dismiss the government's claim on this ground. However, we do find that subrogation is available to the United States to the extent permitted by Louisiana law. We further hold that the United States may pursue any available common law right of recovery against the parish defendants so as to recover for any property the parishes owned and insured under the NFIP.

## II. Case History

The United States instituted two civil actions on behalf of the Federal Emergency Management Agency (FEMA) and the Federal Insurance Administration (FIA), the present and former administrators of the NFIP: (i) No. 81–1808 against the Parish of St. Bernard, the Police Jury of St. Bernard, the Lake Borgne Levy District, the State of Louisiana, and various home builders, engineers, and surveyors; and (ii) No. 81–1810 against Jefferson Parish, the Jefferson Parish Council, Firemen's Insurance Fund Company, La Fourche Basin, Pontchatrain Levy District, Jefferson and West Jefferson Levy Districts, Burk and Associates, and other developers, builders, engineers, and surveyors. The two actions were eventually consolidated. After much jockeying for position, discovery was stayed pending the resolution of the legal availability of the claims filed by the United States.

In its actions the United States alleged that the parish defendants caused massive flood damage by violating their contractual and regulatory obligations to adopt and enforce flood control measures consistent with the parishes' participation in the NFIP. The government sought recovery in contract and implied contract. The United States also contended that the defendants

were liable to the United States as subrogee under the policies of the property owners who had been insured and paid in full by the NFIP. The government further claimed that the defendants' action (or inaction) constituted a public nuisance under Louisiana law. However, as above mentioned, the government later abandoned any public nuisance claim.

The government sought recovery of the money paid to the insured property owners, an injunction for the specific performance of all obligations required from the parishes under the NFIP, and prospective injunctive relief requiring the parish and levy district defendants to implement and enforce the flood control measures in order to minimize future damage.

The parish defendants filed motions for summary judgment. On June 29, 1983, the district court entered an order granting the parishes' motions insofar as the government's complaint sought recovery in contract. The district court's order denied the United States' summary judgment motion for specific performance as a remedy for breach of the alleged contract between the parishes and the United States. The district court also refused to grant the government's summary judgment motion on the availability of subrogation.[1] Thus, over the objection of the United States, the district court entered partial final judgments dismissing the government's public nuisance claim as to all defendants and dismissing the portions of the United States contractual claims insofar as they sought compensation from the parishes.

On July 28, 1983, in response to the defendants' motions, the district court amended its order to reflect that the partial denial of the parishes' motions presented questions of law appropriate for interlocutory appeal under 28 U.S.C. § 1292(b). Meanwhile, the government filed two new actions, No. 83–2077 and 83–2078, against

---

1. In another portion of its order which is not presently before us, the district court rejected the claim of Firemen's Insurance Fund Company that the indemnity policy issued by it to Jefferson Parish did not provide coverage for liability on the claims brought against the parish by the United States and declined to dismiss Firemen's from the case or grant it summary judgment.

Jefferson Parish and the Levy District defendants, and St. Bernard Parish and the Levy District defendants, to recover for flood insurance claims paid in 1982. In these suits the government did not name any non-governmental entities as defendants. These actions were subsequently consolidated with the prior actions.

On August 10, 1983, we denied the parish defendants' application for interlocutory appeal. The United States then moved for reversal of the partial final summary judgments which had been entered against it in appeals No. 83–3557 and 83–3760.

On February 1, 1984, upon a motion for reconsideration, we reversed our prior ruling and granted the defendants leave to pursue an interlocutory appeal. We simultaneously deferred consideration of the government's motion for summary reversal and requested a full briefing on the merits of the government's appeals from the partial dismissal of the public nuisance claims and the contractual claims insofar as they concerned recovery of the United States' payments under the insurance policies. All appeals were consolidated for briefing and argument.

### III. The NFIP

The National Flood Insurance Act of 1968 was enacted by Title XIII of the Housing and Urban Development Act of 1968, Public Law 90–448, August 1, 1968, to provide previously unavailable flood insurance protection to property owners in flood prone areas.[2] 42 U.S.C. § 4001 et seq.

**2.** Mudslide protection was added to the program by the Housing and Urban Development Act of 1969, Public Law 91–152 (December 24, 1969). Flood related erosion protection was added to the program by the Flood Disaster Protection Act of 1973, Public Law 93–234 (December 31, 1973).

**3.** See, Texas Landowners' Rights Association v. Harris, 453 F.Supp. 1025, 1030 (D.D.C.1978). Congress was concerned because many communities decided it was better to remain outside the program and avoid paying any insurance premiums so long as they were able to collect federal disaster relief. The 1973 Act required the purchase of flood insurance on or after March 2, 1974, as a condition to receiving any

Dissatisfied with the lack of commitment being made to the program by the municipalities to which insurance was available, Congress added additional incentives for communities to participate in the NFIP. Congress' persuasive stick—used as an aid to the insufficient insurance carrot—was the Flood Disaster Protection Act of 1973.[3]

To qualify for the sale of federally subsidized flood insurance, a community was required to adopt and submit as part of its application, flood plain management regulations. These regulations were designed to reduce or avoid future flood damages.

However, the 1968 Act required a risk study to be undertaken for each community before it could become eligible for the sale of flood insurance. Since this requirement resulted in a delay in providing insurance protection, Congress established an Emergency Flood Insurance Program to permit the early sale of insurance in flood prone communities. The emergency program did not affect the requirement that a community adopt adequate flood plain management regulations; it only permitted insurance to be sold before a study was conducted to determine actual risk premium rates for the particular community. The emergency program still required the charging of actual risk premium rates for all new construction, substantial improvements, and high limits of coverage on existing structures when a flood insurance rate map became effective.

To qualify for flood insurance, a community was required to apply for the entire

form of federal or federally related financial assistance for the acquisition or construction of insurable buildings and mobile homes within an identified special flood, mudslide, or flood related erosion hazard area located within any community participating in the program. The Flood Disaster Protection Act also requires that on or after July 1, 1975, or one year after a community has been formally notified by the Director of the Flood Insurance Program of its identification as a community containing one or more special flood hazards, no such federal financial assistance shall be provided unless the community in which the area is located is then participating in the program.

area within its jurisdiction.[4] The program requires the community to designate an agency or official with responsibility, authority, and means to implement the specific requirements of the program and to make an annual report concerning the community's participation in the program. The regulations provide that a community is subject to suspension from the NFIP for failure to implement adequate flood plain management regulations. During a suspension, no flood insurance may be sold or renewed.

Thus, the Act contemplates the participation of both the federal agency charged with the program's oversight and the local community government charged with implementing the agency's flood plain regulations. Under the regulations, however, ultimate responsibility for community compliance remains with the Agency since it has the power to suspend any municipality for lack of compliance with the NFIP.

### IV. Resolution of the Issues

■ Many of the general principles applicable to the judicial interpretation of flood insurance policy provisions have been established by prior decision. Federal law governs disputes over coverage arising under the National Flood Insurance Act of 1968. *West v. Harris*, 573 F.2d 873, 880–81 (5th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979). When such disputes arise, they are resolved under federal law "by drawing upon standard insurance law principles." *Id.* at 881; *Drewett v. Aetna Casualty & Surety Co.*, 539 F.2d 496, 498 (5th Cir.1976). *See Hanover Building Materials v. Guiffrida*, 748 F.2d 1011 (5th Cir.1984). Given the importance and complexity of this case, we discuss each disputed issue separately.

#### (a) No Express Contract Created

■ The United States urges that the many letters exchanged between the com-

munities and the agencies charged with implementing the NFIP establish an express contract. In brief, the government reasons that legislation enacted pursuant to the spending power is in the nature of a contract: in return for federal funds, the communities agree to comply with federally imposed conditions. *Pennhurst State Schools v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981); *United States v. Marion County School District*, 625 F.2d 607, 609 (5th Cir.1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981). We believe that *Pennhurst* is dispositive of the government's contract claim. The clear holding of *Pennhurst* is that a "contract" can arise only when the state knowingly and voluntarily accepts Congress' terms.

There can, of course, be no knowing acceptance if a state is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously (citations omitted). By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst*, 451 U.S., at 17, 101 S.Ct. at 1539. Congress failed to make clear in either the statute or regulations that participation in the NFIP created a contract. As a result, the parishes could have no knowing understanding that they would be subjected to almost unlimited liability in actions for monetary damages under the statute by joining the program. We sustain the district court's decision that the NFIP does not form a contract between participating communities and the United States.

#### (b) No Implied Right of Action

The theory of implied private action is, of course, basically a matter of statutory con-

---

**4.** Individual property owners may not purchase flood insurance unless they live in a municipality which has entered the program. To achieve Congress' goal of preventing widespread flood damage through prophylactic land use restric-

tions, an individual who voluntarily complies with the regulations still cannot obtain the benefit of the program without local government action.

struction. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Belluso v. Turner Communications Corp.,* 633 F.2d 393, 395 (5th Cir.1980). For over half a century federal courts readily allowed plaintiffs to imply private causes of action. *See, e.g., Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Texas & P.R.R. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). The Supreme Court began to reverse this trend in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[5]

In response to the United States argument that we should imply a private right of action under the NFIP, we need go no further than our opinion in *Till v. Unifirst Federal Savings & Loan Association,* 653 F.2d 152, 154 (5th Cir.1981). In *Till,* we were asked to read the language and history of the NFIP as affording a cause of action not explicitly provided for by Congress. We analyzed the NFIP under the factors of *Cort v. Ash:* (1) whether the plaintiff is one of a class for whose special benefit the statute was enacted; (2) whether there is an indication of legislative intent to create or deny such remedy; (3) whether such a remedy would be inconsistent with the underlying legislative purpose; and (4) whether the cause of action is one traditionally relegated to state law. *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. As we noted in *Till,* though, in interpreting federal statutes, *Cort* and its progeny have all focused upon the "ultimate issue" of whether it was Congress' intent—either explicit or implicit—to create a private remedy or to deny one. *Till* at 154.[6] *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. *See California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); *Rogers v. Frito Lay, Inc.,* 611 F.2d 1074, 1078 (5th Cir.1980), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980).

 Our quest for Congress' intent must begin with the Supreme Court's warning that in cases where the statutes and legislative history are silent on the question of private remedy, "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross & Co. v. Redington, supra,* 422 U.S. at 571, 99 S.Ct. at 2486. Clearly, the principal purpose in enacting the NFIP was to reduce through the implementation of adequate land use controls and the availability of subsidized flood insurance, the massive and ever increasing burden of federal flood disaster assistance.[7] Nowhere in an examination of

**5.** In more recent cases the Supreme Court has looked almost exclusively to congressional intent—the *Cort v. Ash* criteria being treated as indicia of that intent. *Transamerican Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Since deciding *Cort v. Ash,* the Supreme Court has become even more reluctant to imply new private causes of action for damages. *See Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).

**6.** As the court observed in *Touche Ross & Co. v. Edward S. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), the central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, *see* 422 U.S. at 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26—are ones traditionally relied upon in determining legislative intent.

**7.** In 1968, House Report No. 1585 discussed the purposes and need for a flood insurance program. It stated as follows:

Heavy losses over the years from hurricanes in the coastal areas and from storms in inland areas of the nation dramatize the lack of insurance protection against flood damage. Insurance protection against the risk of destruction caused by tornadoes and other natural catastrophies is generally available, but it is not available against the risk of flood loss.

Communities along the sea coast or in a river basin become completely immobilized following a major flood. Usually they must depend on the federal government and voluntary relief agencies to provide various forms

the language of the NFIP and its legislative history can we find evidence that Congress had any intent to allow a private cause of action, either expressly or by implication.

While the Supreme Court in *Touche Ross* refused to imply a private cause of action partly because other sections of the same Act expressly provided for private remedies, we find applicable what was obviously the main thrust of the Court's reasoning: "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 572, 99 S.Ct. at 2487. Thus, as we found in *Till,* where the statute by its terms grants no private rights to any identifiable class and prescribes no conduct as unlawful, further inquiry is foreclosed. We follow *Till* and hold that no cause of action may be implied under the NFIP.

### (c) No Injunctive Relief Available

 It is black letter law that an injunction will not issue when it would be ineffectual. Under the NFIP a community may withdraw, or it may be suspended by the agency, if it is not in compliance with the regulations governing flood plain construction and management. Nonetheless, the government seeks an injunction to force the parishes to bring into compliance all areas located in flood plains that are in violation of the regulations. The government also seeks a prospective injunction to keep the communities from engaging in future violations.

We can perceive no utility in such a course. Requiring a community to do acts which it may voluntarily choose to avoid is not a proper exercise of judicial power. In no way is community participation in the NFIP required. Deciding to join or remain under the program is a decision left solely by the statute to the local community. This remains true even after Congress created additional incentives to secure more widespread community participation. As a result, it is not a proper use of judicial power to force the parishes to do what they may decide to avoid doing by simply withdrawing from the program.

Similarly, requiring a community to undertake expensive reconstruction projects to bring itself into compliance with the NFIP is fruitless when the agency already possesses the power to suspend any community which is in violation. We certainly agree with the government that a community must be in compliance to remain in the program. However, that is not equivalent to saying we must force a community to comply by means of an injunction. While we can speculate upon the reasons the United States would like to have the court provide such injunctive relief, suffice it to say that we decline to make it available because the agency already has the power to suspend the parishes until they comply with the flood plain regulations.

### (d) Availability of Subrogation

We perceive two inquiries to be dispositive of the United States' claim as to the availability of subrogation. First, we must consider Congress' intent in enacting the NFIP. Second, we must examine the validity of the regulations promulgated by the agency pursuant to Congress' directions.

We first had occasion to consider Congress' intent several years ago in *Drewett v. Aetna Casualty and Surety Co.,* 539 F.2d 496, 497 (5th Cir.1976). The plaintiff in *Drewett* argued that because the statute

of assistance. Some state and local governments have limited programs to assist flood stricken areas, but disaster relief from all of these sources is inadequate to provide for the necessary restoration of heavily damaged areas. These facts underline the need for a program which will make insurance against flood damage available, encourage persons to become aware of the risk of occupying the flood plains, and *reduce the mounting federal*

*expenditures for disaster relief assistance.* H.Rep. No. 1585, 90th Cong., 2d Sess., reprinted in [1968] U.S.Code Cong. & Adm.News 2873, 2966–67.
For further evidence of the interest of Congress in reducing the burden on federal funds through land use controls and insurance, see Senate Report No. 93–583, 93rd Cong., 1st Sess., reprinted in [1973] U.S.Code Cong. & Adm.News 3217, 3218–20, 3223.

creating the NFIP anticipated premiums which were lower than the actuarial cost of insuring property in flood prone areas (the difference being subsidized by the federal government, *see* 42 U.S.C. §§ 4014 and 4015), it was inappropriate to apply general insurance law principles, which were originally developed to apply to profit seeking insurance companies.

We held Drewett's contention to be without merit. As we stated in the context of the NFIP as it was then operated:

> [T]he flood insurance program is administered with cooperation between the federal government and private insurance companies; the private companies carry some of the risk, although the federal government stands ready to reinsure and reimburse excessive losses. 42 U.S.C. § 4017, 4041–84. The Program also requires ongoing actuarial studies to help set the premiums to be charged, 42 U.S.C. § 4014. The eventual goal of the Program is to discourage building in flood prone areas by raising, over time, the premiums actually charged to equal the actuarial cost of flood insurance. *See* U.S. Code Cong. & Adm. News (1968) at 2969, reprinting House Report No. 1585, 90th Cong., 2d Sess. (1968).
>
> *In short, although the Program offers subsidized flood insurance, it is designed to operate much like any private insurance company and eventually to eliminate the subsidy. Because the Program's exposure to claims and its premiums are required to be estimated in accordance with standard insurance practices, and because private insurers carry part of the risk, it is clear that Congress did not intend to abrogate standard insurance law principles which affect such estimates and risks.* Nothing in the statute or regulations promulgated under it, *see* 24 C.F.R. Part 1909–18, requires otherwise.

*Drewett* at 498 (emphasis added).

We can perceive no reason the NFIP should be seen as operating differently now that the federal government has displaced private insurance companies. The actuarial studies required for the assessment of risk premiums remains the same. Indeed, the agency has long had the choice of operating the program privately or publicly. The reason the NFIP is now operated entirely by the government is because studies convincingly showed this would achieve greater economy.

As to the second inquiry—the validity of the agency regulations issued to implement the NFIP—it must be noted that the insurance policy used by the government is the same policy issued to property owners when private companies were employed as agents for the government under the NFIP. When the government assumed the responsibilities formerly performed by the private companies, the agency published the insurance policy in the Code of Federal Regulations. It has been published there ever since. Nonetheless, defendants in these cases contend that the inclusion of the policy's subrogation clause is an unwarranted assumption of power by the agency outside the scope of congressional intent now that the United States operates the program. This, of course, is a very hard road for the defendants to travel since Congress delegated to the agency the responsibility for writing the regulations under which the NFIP would operate.

The standards by which federal regulations are to be judged were well stated in *New York Foreign Freight Forwarders and Brokers Association v. The Federal Maritime Commission*, 337 F.2d 289, 295 (2d Cir.1964), *cert. denied*, 390 U.S. 910, 914, 85 S.Ct. 893, 902, 13 L.Ed.2d 797, 800 (1965). The court observed that: (1) a regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity; and (2) a regulation or administrative practice is ordinarily valid unless it is (a) unreasonable or inappropriate or (b) plainly inconsistent with the statute.

Thus, our scope of review of the agency issued regulations is limited. Such judicial restraint in the assessment of administrative regulations is rooted in a realistic view of the legislative process. Legislation can-

not undertake to deal with every situation. Accordingly, Congress creates an administrative agency so that experts who are familiar with the task Congress has identified can address the problems in all their intricacies. The Supreme Court carefully explained the necessary and proper function of agency rulemaking in *American Trucking Associations, Inc. v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). In that case the Interstate Commerce Commission had issued rules prohibiting short-term or trip leasing by motor carriers. The court held that promulgation of the rules was within the Commission's power—despite the absence of specific reference to leasing practices in the Motor Carrier Act.

All urge upon us the fact that nowhere in the Act is there an express delegation of power to control, regulate or effect leasing practices, and it is further insisted that in each separate provision of the Act granting regulatory authority there is no direct implication of such power. Our function, however, does not stop with a section-by-section search for the phrase "regulation of leasing practices" among the literal words of the statutory provisions. As a matter of principle, we might agree with appellant's contention if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. *National Broadcasting Company v. United States,* 319 U.S. 190, 219–20, 63 S.Ct. 997, 1010–11, 87 L.Ed. 1344; *Phelps Dodge Corp. v. National Labor Relations Board,* 313 U.S. 177, 193–94, 61 S.Ct. 845, 852, 85 L.Ed. 1271. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. *United States v. Pennsylvania Railroad Co.,* 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499.

*American Trucking,* 344 U.S. at 309–10, 73 S.Ct. at 314–15. Similar thoughts on the judicial restraint necessary when assessing agency regulations were expressed more recently by the Supreme Court in *American Union Transport, Inc. v. United States,* 257 F.2d 607, 612 (D.D.C.), *cert. denied,* 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958). The Court focused on "[t]he great complexity of our economy [which] induced Congress to place ... the regulation[s] in specialized agencies with broad powers." The Supreme Court emphasized that we must be "slow to interfere with the conclusions of such agencies when [their regulations are] reconciliable with statutory directions."

As to the task of reconciling regulations with their statutory authorization, courts give great deference to the interpretation given the statute by the officers or agency charged with its administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Commission v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136, 145 (1946). *See also, Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941); *Universal Battery Co. v. United States,* 281 U.S. 580, 583, 50 S.Ct. 422, 423, 74 L.Ed. 1051, 1054 (1930). "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *See Udall v. Tallman,* 380 U.S., at 16, 85 S.Ct. at 801, *citing Power Reactor Co. v. International*

*Union of Electrical, Etc.,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961).

Defendants in these cases rely upon the surely correct proposition that the power of an agency when administering a federal statute and prescribing regulations is not the power to make law. *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). We believe the defendant's hornbook restatement of the law to be as accurate as it is inapposite. The inquiry before us is nothing more than the reasonableness of including subrogation as part of Congress' scheme to employ insurance principles as a cost saving mechanism in lieu of direct disaster relief appropriations. We would be disputing with the sophists if we doubted for a moment that:

> government is a practical affair intended for practical men. Both officers, lawmakers and citizens naturally adjust themselves to any long continued action of the Executive Department—on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation.

*See Udall v. Tallman,* 380 U.S., at 17, 85 S.Ct. at 801–802, *citing United States v. Midwest Oil Co.,* 236 U.S. 459, 472–73, 35 S.Ct. 309, 312–13, 59 L.Ed. 673, 681 (1915). We hold that the agency's adoption of the insurance policy formerly issued by private companies with its inclusion of a subrogation clause was within the framework contemplated by Congress and that the United States may pursue subrogation.

**8.** We are aware, of course, that Louisiana is not a common law state. Nonetheless, some term is needed to identify the causes of action outside

### (e) Parish Liability to Suit and the Availability of a Common Law Remedy [8]

It is settled law that the parishes are not protected from suit by the eleventh amendment. As the Supreme Court observed in *County of Lincoln v. Luning,* 133 U.S. 766, 767, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1889), "the Eleventh Amendment limits ... jurisdiction only as to suits against a state." It has been the clear rule since the time of Chief Justice Marshall that "the Eleventh Amendment ... is of necessity limited to those suits in which the state is a party on the record." *Osborn v. The Bank of the United States,* 22 U.S. (9 Wheat.) 738, 857, 6 L.Ed. 204 (1824).

Since the eleventh amendment constitutes no bar to a suit against the parishes, our next inquiry is whether Louisiana law allows such a suit. The doctrine of sovereign immunity has been abandoned in Louisiana. However, this does not mean a parish may be sued for any cause. Parish liability is limited by the step-child of the old doctrine of sovereign immunity—the public duty doctrine. This doctrine, adopted in Louisiana, was well stated in *Stewart v. Schmieder,* 386 So.2d 1351, 1357 (La.1980).

> The rule of official responsibility, then, appears to be this: that if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an adequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. "The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and

the NFIP and Louisiana insurance law. We use common law as such a descriptive moniker here.

that he has suffered a special and peculiar injury by reason of its non-performance."

The parishes' adoption of flood control measures and their responsibility for inspecting and maintaining defenses against the possibility of rising flood waters does not impel the automatic application of the bar of the public duty doctrine. Louisiana case law permits the conclusion that the parishes can be found liable after trial for the breach of what may be perceived to be at first glance as a public duty. *Bacile v. Parish of Jefferson,* 411 So.2d 1088 (La.App.1981); *Jones v. City of Baton Rouge,* 388 So.2d 737 (La.1980); *McCloud v. Parish of Jefferson,* 383 So.2d 477 (La. App.1980); *Broussard v. Parish of Jefferson,* 375 So.2d 722 (La.App.1979); *Lewis v. Fireman's Fund Ins. Co.,* 342 So.2d 244 (La.App.1977); *Jackson v. Parish of East Baton Rouge,* 331 So.2d 64, 65 (La.App. 1976); *Contranchis v. Parish of Jefferson,* 299 So.2d 513 (La.App.1974); *Toppi v. Arbour,* 119 So.2d 621 (La.App.1960).

Of course, it is a fundamental principle of insurance law that an insurer may not sue its own insured on the insurance policy. The law has recognized, however, that there may be causes of action by an insurer outside the policy, i.e. fraud. It is with this understanding that we now consider the United States' claim as to the availability of common law remedies.

This circuit, along with others, has recognized that the government has a common law right to recoupment. *Jacquet v. Westerfield,* 569 F.2d 1339, 1345 (5th Cir.1978); *Woods v. United States,* 724 F.2d 1444, 1448 (9th Cir.1984); *United States v. Mead,* 426 F.2d 118, 124 (9th Cir.1970); *United States v. Silliman,* 167 F.2d 607, 610 (3d Cir.1948), *cert. denied,* 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948). However, an inextricable part of any decision as to the availability of a common law remedy must focus upon not only what remedies were intended by Congress in passing the NFIP, but also upon what remedies were foreclosed.

Thus, although in *Jacquet v. Westerfield* we held that the power to disqualify food stamp recipients on account of fraud was "inherent in the effective administration of such a program," at issue in *Jacquet* was a disqualification regulation. It is with this background that we said "[n]ot only is recoupment an appropriate administrative tool, but the government also has a common law right to recoup value fraudulently obtained from it." *Jacquet* at 1346.

In *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329, 338 (5th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976), we made the observation that "[t]he recoupment right does not always fit consistently and logically into the statutory system, but the alternative of no right to recoup produces even more severe incongruities." Thus, though the general principle is, as we observed in *United States v. Bellard,* 674 F.2d 330, 333 (5th Cir.1982), that the courts are reluctant to find legislative enactments in derogation of the common law, this general rule cannot be viewed as a talisman; it must be tempered by the specifics of the program adopted by Congress. Accordingly, the availability of common law remedies is primarily a hunt for a species of congressional intent.

In our search of Congress' intent in enacting the NFIP we cannot escape the conclusion that it would be incongruous for the same body which did not contemplate express or implied contractual remedies against the defendants to have intended that the full panoply of common law actions remain available against the same defendants. It is not reasonable for us to conclude that Congress would have thought that the parishes would have voluntarily entered a program such as the NFIP—which involved many restrictions upon land use—if they thought they were going to be subject to massive tort liabilities. It is unreasonable to argue, as the United States seemingly does, that the NFIP, a program designed to lessen the massive public outlay for federal disaster assistance, could be foisted in its entire cost onto the very people Congress was

trying to protect from the prohibitive cost of flooding.

 Our decision that Congress did not intend to allow recovery from the defendants under the whole of common law torts, however, is not tantamount to saying that no action can lie against the parishes for the value of the property the parishes owned and insured under the NFIP. Moreover, since under standard insurance law principles the United States as an insurer cannot sue the parishes as its insureds under the NFIP policies, any action against the parishes concerning parish property insured under the NFIP is extremely limited. Although actions for fraud have traditionally been recognized at common law as a means of recovery from insureds by their insurers, we do not say at this early stage of the litigation—prior to any real discovery having occurred—that this will be the only non-subrogation action available by the United States against the parishes. It is only with this understanding of the very narrow nature of the causes of action available to the United States against the parishes for the value of the property owned and insured under the NFIP that we give the green light to the United States to pursue common law remedies against the parishes. Suffice it to say since none of the claims that may be articulated in subrogation actions against the parishes are available to the United States as an insurer, any action by the United States against the parishes for the value of the property which the parishes insured under the NFIP must not be in violation of the fundamental principle of insurance law that an insurer cannot sue its insured. To this limited extent expressed in our opinion, a common law remedy is available to the United States against the parishes.

## V. Conclusion

By way of summation, we affirm the district court's summary disposition of the United States' express contract and public nuisance claims. We further hold that the United States is not entitled to pursue an implied right of action or injunctive relief under the NFIP. However, subrogation, and any applicable causes of action at common law which do not violate fundamental insurance law principles for recovery of the value of the property the parishes owned and insured under the NFIP, remain available.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

JERRE S. WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

I concur in all of my brother Brown's opinion for the Court in this case with the exception of IV(a) in which he concludes that the conditional grant in aid program did not create a contract between the federal government and the local governmental entities. This conclusion is contrary to a long line of established Supreme Court authority. The 1866 Supreme Court case of *McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155, 18 L.Ed. 314 said: "It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State constituted a contract. All the elements of a contract met in the transaction—competent parties, proper subject-matter, sufficient consideration, and consent of minds. This contract was binding upon the State." In our own controlling case on this issue, *United States v. Marion County School Dist.*, 625 F.2d 607 (5th Cir.1980), we quoted the *McGee* case at 609 n. 4. The *Marion County* case involved contractual assurances by the school district of compliance with the prohibitions against racial discrimination in the Civil Rights Act in the operation of federally funded schools. At p. 609, our ruling was specific:

As the Supreme Court has long recognized, the United States may attach conditions to a grant of federal assistance, the recipient of the grant is obligated to perform the conditions, and the United States has an inherent right to sue for enforcement of the recipient's obligation in court. *E.g., Rex Trailer Co. v. United States*, 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956); *United States*

*v. San Francisco,* 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940); *Cotton v. United States,* 52 U.S. (11 How.) 229, 231, 13 L.Ed. 675 (1850); *Dugan v. United States,* 16 U.S. (3 Wheat.) 172, 181, 4 L.Ed. 362 (1818).

The same principle is stated in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981), the case relied upon by the majority opinion for the contrary result. In the paragraph immediately preceding the paragraph quoted in the majority opinion, the Supreme Court gives the following recognition to the nature of a conditional grant as a contract:

> Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." *See Steward Machine Co. v. Davis,* 301 U.S. 548, 585–598, 57 S.Ct. 883, 890–896, 81 L.Ed.2d 1279 (1937); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

The conditions the United States Government placed upon the grant in this case were clear and precise. Obviously the government knew that it was undertaking large financial obligations in supplying flood insurance to the citizens of the Parishes. It insisted upon conditions which would substantially cut down on that liability. The conditions which the Parishes were alleged to have breached were two in number. First, they failed to implement and enforce the specific land use and control requirements which they had obligated themselves to enforce. As a result, a number of buildings were built below the flood level elevation requirements which the Parishes promised to meet. Second, even more specifically, the Parishes failed to carry out unequivocal promises concerning the establishment of adequate drainage systems involving pumps, canals, levies, and culverts. The United States further charges that the Parishes failed to keep drainage pumps in proper repair so that they would operate in situations involving flood emergencies.

These failures had to do with specific promises which the Parishes were required to make to be entitled to obtain for themselves and their citizens the flood insurance protections under the National Flood Control Act and the Flood Disaster Protection Act. I concede, of course, that the Court in *Pennhurst* did state that Congress must intend to impose clearly and unambiguously the conditions on the grant. Of course, the clearness and certainty come from the administrative requirements established under congressional authorization rather than requirements in the statute itself. Virtually all conditional grants by the federal government occur through an administrative process that establishes the specific conditions and creates the contract under the general grant of authority from the Congress. Congress does not write the contract, nor does it sign it. The administrator writes the contract and signs it on behalf of the government.

It cannot be said in this case, in the words of *Pennhurst,* that a local governmental entity was "unaware of the conditions or [was] unable to ascertain what [was] expected of it." The conditions were clear and precise, and a contract was created under this conditional flood insurance program. A contract is the normal and usual outgrowth of a conditional grant of federal largesse, and there is no reason to treat this case as an exception.

Admittedly the more serious question is not whether a contract was created, but whether the local government bodies can be held liable for the consequential damages arising from their failures to carry out the contract provisions. These failures ultimately resulted in the federal government having to pay large flood insurance claims which, the federal government asserts, would not have arisen if the Parishes had carried out their contract obligations.

Of course, upon trial the federal government would have to prove that the failure of the Parishes to carry out these contract obligations caused the damages. But there is absolutely nothing in the law of contracts, governmental or otherwise, giving the Parishes any privileged position with respect to liability for consequential damages for breach of contract. If the government can establish the link in causation, the Parishes are liable under the most elementary common-law principles. 5 Corbin, CONTRACTS §§ 997, 998.

The fact that federal monies were not paid directly to the Parishes but were paid through flood insurance claims to the citizens of the Parish does not alter the nature of the case. In *Grove City College v. Bell,* —— U.S. ——, 104 S.Ct. 1211, 1216, 79 L.Ed.2d 516 (1984), the Supreme Court recognized that the College benefitted by a federal aid program even though all funds were paid directly to the students. The Court found that the College, therefore, was subject to the conditions attached to the receipt by the students of the federal financial assistance under the Civil Rights Act. The Court specifically recognized that the federal disbursements to the students benefitted the College through relieving it of financial burdens which it would otherwise have to bear in the absence of the federal assistance. Precisely the same considerations are applicable where it was to the obvious benefit of the Parish to obtain federal flood control insurance for its citizens. The contract existed, and its legal consideration from the point of view of the Parish was the interest of the Parish in obtaining for its citizens the subsidized federal flood control program.

Finally, I stress that I am in full agreement with the conclusion of the Court, in IV(c) of the opinion, that the government is not entitled to specific performance to enforce the contract in the future. The contract was without duration. The sanction for continuing violation of the contract by the Parishes was suspension from the program. 24 C.F.R. § 1909.24. The Parishes are not required by law to continue in the program. They can drop out at any time.

*See Guardians Ass'n v. Civil Service Comm. of the City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983). Thus there is no legal right to force them through a specific performance decree to continue to abide by the contract. This conclusion, however, does not in any way affect the liability of the Parishes for damages to the United States Government while the contract has been in effect. The federal government is entitled to undertake to prove its case with respect to those damages. The district court erred in granting a partial summary judgment against such federal claims. I must dissent because this Court affirms the partial summary judgment which was erroneously granted on this issue.