33 F.3d 1263
 Graham L. COLE, Plaintiff-Counter-Defendant, Appellee,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE, Agricultural
Stabilization and Conservation Service,
Defendants-Counter-Claimants, Appellants.
 No. 93-8230.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 13, 1994.
 
 Edgar W. Ennis, Jr., U.S. Atty., H. Randolph Aderhold, Jr., Asst. U.S. Atty., Macon, GA, Barbara C. Biddle, Edward R. Cohen, Appellate Staff, Civ.Div., Dept. of Justice, Washington, DC, for appellants.
 C. Saxby Chambliss, David R. Tyndall, Moultrie, GA, for appellee.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before ANDERSON and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 The United States Department of Agriculture imposed monetary penalties on plaintiff-appellee Graham L. Cole, a tobacco dealer, under statutes and regulations governing the marketing of tobacco. After unsuccessfully challenging the penalties at the administrative level, Cole brought the present action in district court, eventually moving for summary judgment on the ground that the Secretary of Agriculture lacked specific statutory authority to impose a penalty for Cole's conduct. The district court agreed and granted Cole's motion. We are presented with an appeal from a grant of summary judgment involving issues of law; therefore we review the district court's ruling de novo. Akins v. Snow, 922 F.2d 1558, 1560 (11th Cir.1991); Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 157 (11th Cir.1990).
 
 
 2
 Although in the district court Cole asserted several factual defenses to the imposition of the penalty in this case, Cole's motion for summary judgment, and the district court's grant thereof, were based solely upon Cole's argument that there was no statutory authority for the imposition of this particular penalty. Cole concedes that the penalty assessed against him was imposed pursuant to a correct application of the regulations at issue; accordingly, Cole's argument is that there is no statutory authority for the regulations. The gist of Cole's argument is that the statute authorizes the imposition of a penalty when a producer sells over-quota tobacco to a dealer, but does not authorize the imposition of a penalty upon the next stage in the marketing process, i.e., upon the dealer's resale. Because the regulations focus on the second event (the dealer's resale), and because the penalty in the instant case was imposed upon dealer Cole on account of his resale, Cole argues that the regulation and the penalty imposed in this case are beyond statutory authority. In other words, Cole argues that the regulation imposes the penalty on the wrong event. In response, the government argues that proof of the second event triggers a presumption by virtue of which the first event is inferred; that is, that a regulatory presumption operates to sap Cole's argument of all of its force. A brief review of the statutory and regulatory framework is required for an understanding of this case.
 
 STATUTORY AND REGULATORY FRAMEWORK
 
 3
 The marketing of tobacco is subject to government regulation pursuant to the Agricultural Adjustment Act of 1938 (codified as amended at 7 U.S.C. Sec. 1311 et seq.). In addition to statutory guidelines, the Act authorizes the Secretary of Agriculture to issue regulations for the enforcement of the marketing scheme.[1] 7 U.S.C. Sec. 1375. The amount of tobacco marketed is controlled by a quota system that establishes an allotment to each tobacco-producing farm. The marketing of tobacco in excess of a producer's allotment is subject to a penalty, as specified in 7 U.S.C. Sec. 1314(a):
 
 
 4
 The marketing of ... any kind of tobacco in excess of the marketing quota for the farm on which the tobacco is produced ... shall be subject to a penalty of 75 per centum of the average market price ... for such kind of tobacco for the immediately preceding market year. Such penalty shall be paid by the person who acquired such tobacco from the producer but an amount equivalent to the penalty may be deducted by the buyer from the price paid to the producer
 
 
 5
 ....
 
 
 6
 Thus, the statute provides that when a dealer or other purchaser buys tobacco from a producer in excess of the producer's allotment (over-quota tobacco), the purchaser must remit the penalty to the government; the purchaser may then recover the penalty from the producer. Cole acknowledges that he is a dealer who purchases tobacco from producers, among other sources. Any person who acquires over-quota tobacco--a broad class that includes dealers such as Cole--is subject to collection of a penalty under Section 1314(a).
 
 
 7
 The marketing scheme involves a regulatory record-keeping mechanism that accounts for all tobacco sales and purchases. The Department of Agriculture ("USDA") issues a marketing card to each producer. A marketing card shows the producer's total allotment or quota; every time the producer sells tobacco, the quantity of the sale is noted on the card. Purchasers from a producer should, and as a practical matter do, look at the producer's card at the time of each purchase; and thus, it is readily apparent to any purchaser when the producer has sold his quota of tobacco. In addition, parties who purchase tobacco (including dealers) are required to report the amount of each purchase to the USDA. Similarly, each purchaser is required to report each resale. Thus there is a reported accounting each time the ownership of a pound of tobacco changes.[2]
 
 
 8
 The USDA's regulations also provide for penalties when dealers sell more tobacco than they have reported purchasing or fail to report the resale of tobacco. These regulations--the subject of this action--provide as follows:[3]
 
 
 9
 (d) Dealer's tobacco. The flue-cured tobacco resales by a dealer which are in excess of his total prior flue-cured tobacco purchases shall be considered to be a marketing of excess tobacco and penalty thereon shall be due at the time the marketing takes place which results in the excess....
 
 
 10
 7 C.F.R. Sec. 725.94(d) (1989 ed.) (parenthetical material omitted).
 
 
 11
 (e) Resales not reported. Any resale of tobacco which is required to be reported by a warehouseman or dealer, but which is not so reported within the time and in the manner required, shall be considered to be a marketing of excess tobacco, unless and until such warehouseman or dealer furnishes a report of such resale which is acceptable to the State executive director. The penalty thereon shall be paid by the warehouseman or dealer who fails to make the report as required.
 
 
 12
 7 C.F.R. Sec. 725.94(e) (1989 ed.).
 
 DISCUSSION
 
 13
 Accepting Cole's argument that the regulations impose the penalty on the wrong event, the district court concluded that the regulation went beyond the statutory authority. The flaw in the district court's analysis of this case was its failure to recognize that the relevant regulations create a rebuttable presumption that dealer Cole purchased over-quota tobacco from a producer. The district court never addressed the government's indication that the regulations impose a presumption. Nor did Cole address the presumption issue in the district court. On appeal, Cole acknowledges that the regulations create a presumption. Appellee's Br. at 13 n. 6, 19.[4] However, apparently failing to recognize the significance of that fact, Cole does not address the legal significance of the presumption or the legal principles governing regulatory presumptions.
 
 
 14
 The government contends that 7 C.F.R. Sec. 725.94(d) and (e) create a presumption: when a tobacco dealer sells more tobacco than he has reported buying, or when a dealer fails to report a resale of tobacco, it is presumed that the tobacco sold was over-quota tobacco, i.e., tobacco purchased from a producer in excess of that producer's quota. The relevance of this presumption is obvious. The presumed fact--purchase of over-quota tobacco from a producer--is the fact, Cole acknowledges, that triggers the statutory penalty.[5] Thus, if the presumed fact properly flows from the predicate fact--a dealer's resale of more tobacco than he reported buying or a dealer's failure to report a resale--then Cole's argument must fail.
 
 
 15
 As mentioned, Cole acknowledges for purposes of summary judgment that the fact to be presumed would authorize the penalty. Nor does Cole in this summary judgment posture contest the predicate fact, i.e., that in fact he did resell more tobacco than he reported purchasing or that he did fail to report resales. Thus, if the presumed fact properly flows from the predicate fact, it is clear that the penalty at issue was appropriately imposed.
 
 
 16
 Viewed in proper perspective, the true issue in this appeal is the validity of the regulatory presumption. The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts. Alabama By-Products Corp. v. Killingsworth, 733 F.2d 1511 (11th Cir.1984); Atchison, T. & S.F. Ry. v. ICC, 580 F.2d 623, 629 (D.C.Cir.1978). In Killingsworth, this court was confronted with a challenge to a regulatory presumption adopted under the Federal Coal Mine Health and Safety Act of 1969. Although that case, unlike the present one, involved a direct challenge to the constitutionality of the presumption under the Due Process Clause, the standard employed in Killingsworth is generally applicable: a presumption is valid "if there is some rational connection between the fact proved and the ultimate fact presumed, and the inference of one fact from proof of another is not so unreasonable as to be a purely arbitrary mandate." Alabama By-Products Corp. v. Killingsworth, 733 F.2d at 1517 (citing Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976)). See also Atchison, T. & S.F. Ry. v. ICC, 580 F.2d 623, 629 (D.C.Cir.1978) (adopting the rational connection test when determining whether "presumptions embodied in the challenged regulations represent a legitimate exercise of the [agency's] authority" under the applicable statute).
 
 
 17
 Thus, in challenging the validity of the regulatory presumption in this case, Cole bears the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed. As mentioned above, however, Cole does not address the issue of the validity or rationality of the presumption. Therefore, we must take the arguments he does make and assess their relevance and significance when cast in the proper context: as challenges to the validity of the regulatory presumption. We discuss in turn the several arguments asserted by Cole.
 
 
 18
 First, Cole argues that the penalty is not imposed on dealers like himself, but rather is imposed only upon producers, i.e., farmers. This argument is without merit, because the express language of the statute itself provides for collection of the penalty from the broad class of persons who buy tobacco from producers, which of course includes dealers. Indeed, Cole never argues that the penalty against him would have been improper had the government based it upon his purchase of over-quota tobacco from a producer. Rather, Cole merely uses this first argument to enhance the appeal of his major argument discussed immediately below, namely, that the regulations impose the penalty on the wrong event.[6]
 
 
 19
 Second, the major thrust of Cole's argument is that the statute authorizes a penalty upon event A--i.e., the sale of over-quota tobacco by a producer to a dealer--whereas the regulation imposes a penalty upon event B-- i.e., the resale by a dealer. Thus, Cole argues, the regulation has penalized the wrong event and is beyond the statutory authority. It is immediately apparent that Cole's argument fails to recognize the significance of the regulatory presumption. To the extent that the fact to be presumed (event A) is properly inferred from proof of the predicate fact (event B), Cole's argument evaporates. The USDA is not, in fact, imposing a penalty on event B. Rather, event B is merely evidence of event A, and it is uncontested that a penalty may be imposed upon event A.[7]
 
 
 20
 Thus, we are taken back again to the true issue in this appeal: the validity and rationality of the regulatory presumption. We continue our consideration of the only arguments asserted by Cole that are relevant to this issue.
 
 
 21
 Cole faults the government for failing to affirmatively identify over-quota tobacco that has been purchased by Cole from a producer. The obvious flaw in this argument is that this is precisely the fact to be presumed, thus implicating again the necessity for Cole to demonstrate that the presumption is irrational. Cole's argument also misplaces the burden. It is the party challenging the validity of the presumption who must demonstrate that it is irrational. Alabama By-Products Corp. v. Killingsworth, 733 F.2d 1511, 1517 (11th Cir.1984) (noting that the burden of proving arbitrariness is on a party challenging a statutory presumption on due process grounds); Atchison, T. & S.F. Ry. v. ICC, 580 F.2d 623, 629 (D.C.Cir.1978) (regulatory presumptions are entitled to deference); United States v. Parish of St. Bernard, 756 F.2d 1116, 1124 (5th Cir.1985) (a regulation is presumptively valid, and one who attacks it has the burden of showing invalidity), cert. denied, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986). Thus, the burden is on Cole to demonstrate that the regulatory presumption at issue is invalid because the presumed fact has no rational connection with the predicate fact.
 
 
 22
 Cole has adduced no evidence, nor proffered any reasons which pass scrutiny, indicating that there is no rational connection between the presumed fact and the predicate fact. Moreover, there is nothing intuitively irrational about the instant presumption. To the contrary, the fact that the predicate fact involves the immediately succeeding stage in the marketing process suggests potential rationality.[8] For example, consider the following hypothetical case. A producer with a quota of 10,000 pounds of tobacco instead grows 12,000. The producer then sells his entire production to a single dealer. The producer and the dealer agree that both parties will report the marketing of only 10,000 pounds, thus hiding the excess.[9] The dealer later resells and properly reports 10,000 pounds of tobacco, but resells without reporting the additional 2,000 pounds. The innocent purchaser of those 2,000 pounds, however, should report the sale. At the end of the marketing year, the USDA discovers that the dealer has sold 2,000 more pounds of tobacco than he reported. Under the regulation, the predicate fact (i.e., that the dealer sold 2,000 more pounds than he reported) provides the basis for inferring the fact to be presumed (i.e., that the dealer purchased the 2,000 pounds as over-quota tobacco from a producer). It seems apparent in this hypothetical case that the predicate fact does provide some relevant evidence of the fact to be presumed.[10]
 
 
 23
 The connection between the predicate fact and the fact to be presumed must also be placed in proper context--that is, a context in which every purchase and every sale of tobacco is required by regulation to be recorded and reported. Thus, the required records account for every purchase by every dealer, and also every resale. A dealer's resales should precisely balance that dealer's purchases. In addition, the record of each purchase should indicate whether it included over-quota tobacco subject to the penalty. Finally, and significantly, the equity of the obligation placed upon dealers like Cole is ensured by the fact that a dealer should always know when he is purchasing over-quota tobacco; the producer's card will readily reveal this fact. Through this regulatory scheme, a dealer's resales (the predicate event) are linked by the regulatory framework to that dealer's purchases (which necessarily include any over-quota purchases from a producer, the event to be presumed). Thus, when the predicate fact in this case and the presumed fact are viewed in their context of this regulatory scheme, the relationship is obviously close.
 
 
 24
 Indeed, the statute itself would seem to contemplate this close regulatory relationship between the several stages of the marketing process. 7 U.S.C. Sec. 1375(a) provides:
 
 
 25
 The Secretary shall provide by regulations for the identification, wherever necessary, of corn, wheat, cotton, rice, peanuts, or tobacco so as to afford aid in discovering and identifying such amounts of the commodities as are subject to and such amounts thereof as are not subject to the marketing restrictions in effect under this subchapter.
 
 
 26
 Thus, the statute specifically authorizes regulations that will identify the commodity at the various stages for the express purpose of aiding "in discovering and identifying such amounts of the commodities as are subject to" the various penalties and other restrictions. This seems to contemplate identifying and proving over-quota tobacco by means of evidence reflecting the identity of the commodity at the various stages in the marketing process.
 
 
 27
 Finally, Cole argues in vague terms that it is possible for there to be a sale of more tobacco than recorded purchases without necessarily involving over-quota tobacco.[11] It is obvious that the mere possibility asserted by Cole falls far short of demonstrating that there is no rational nexus at all. The mere statement that the fact to be presumed does not always follow necessarily from the predicate fact obviously leaves ample room for some lesser, though still rational, connection between the two. If indeed a dealer oversold for some reason other than the purchase of over-quota tobacco--for example, by inadvertently underreporting a legitimate purchase--he could avoid being assessed a penalty by adducing proof of the error.[12]
 
 
 28
 The instant case is an appeal by the government from the district court's grant of summary judgment in favor of Cole. In this posture, we need hold only that on this summary judgment record Cole has failed to demonstrate that the regulatory presumption is irrational or otherwise invalid. We so hold. Accordingly, the judgment of the district court is reversed, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 29
 VACATED and REMANDED.
 
 GODBOLD, Senior Circuit Judge, dissenting:
 
 30
 Graham L. Cole raises, buys, sells and warehouses tobacco. This case is a consequence of his failure to maintain correct records as a tobacco dealer. The failures relate mostly to sales of more tobacco than his records showed that he had purchased, and, to a much smaller extent, to sales not reflected in his records at all. By statute, 7 U.S.C. Sec. 1373, for his record-keeping failures Cole could be found guilty of a misdemeanor and, upon conviction, fined up to $5,000. The Secretary of Agriculture ignored these statutory penalties and charged against Cole penalties totalling $398,756.59, some 80 times greater than the maximum Sec. 1373 fine, based upon what the Secretary describes as a "system" or "regime" for controlling sales of tobacco by tobacco farmers in excess of quotas assigned to them. On summary judgment the district court found that the Secretary had acted beyond his statutory authority. This court reverses the summary judgment and remands the case for further consideration.
 
 
 31
 I would affirm the summary judgment.
 
 
 32
 By the Agricultural Adjustment Act of 1938 Congress provided for the orderly marketing of tobacco.[1] The Act directs the Secretary to promulgate regulations for its enforcement,[2] and he has put in place record-keeping regulations described in the opinion of this court. Congress itself has addressed the failure of a tobacco dealer to keep and maintain correct records as required by the Secretary and has defined the consequences of such failure.
 
 
 33
 7 U.S.C. Sec. 1373 Reports and records.
 
 
 34
 (a) Persons reporting.This subsection shall apply to warehousemen, processors, and common carriers of [other designated commodities] or tobacco, and ... all persons engaged in the business of purchasing [other designated commodities] or tobacco from producers.... Any such person shall, from time to time on request of the Secretary, report to the Secretary such information and keep such records as the Secretary finds to be necessary to enable him to carry out the provisions of this subchapter [which includes Sec. 1314(a) ]. Such information shall be reported and such records shall be kept in accordance with forms which the Secretary shall prescribe. For the purpose of ascertaining the correctness of any report made or record kept, or of obtaining information required to be furnished in any report, but not so furnished, the Secretary is authorized to examine such books, papers, records, accounts, correspondence, contracts, documents, and memorandum as he has reason to believe are relevant and are within the control of such person. Any such person failing to make any report or keep any record as required by this subsection or making any false report or record shall be deemed guilty of a misdemeanor and upon conviction thereof shall be subject to a fine of not more than $500; and any tobacco warehouseman or dealer who fails to report such violation by making a complete and accurate report or keeping a complete and accurate record as required by this subsection within fifteen days after notice to him of such violation shall be subject to an additional fine of $100 for each ten thousand pounds of tobacco, or fraction thereof, bought or sold by him after the date of such violation: Provided, that such fine shall not exceed $5,000....
 
 
 35
 To understand what has happened to Cole one must understand the "regime" or "system" erected by the Secretary--the phrase is his--to control sales of excess ("over-quota") tobacco by the farmers who have produced it. The Secretary establishes a national marketing quota for each type of tobacco, which is apportioned among the states, and finally an allotment or quota is assigned to each tobacco-producing farm. 7 U.S.C. Secs. 1312, 1313(a) and (b). In Sec. 1314(a) the Act provides for a heavy penalty upon the marketing of any tobacco in excess of the marketing quota for the farm on which it is produced, to be paid by the person who acquires such tobacco from the producer. The acquiring person, who is the collector and remitter of the tax on the transaction, may recoup by deducting from the price paid to the producer an amount equivalent to the penalty.
 
 
 36
 (a) The marketing of (1) any kind of tobacco in excess of the marketing quota for the farm on which the tobacco is produced, ... shall be subject to a penalty of 75 per centum of the average market price ... for such kind of tobacco for the immediately preceding marketing year. Such penalty shall be paid by the person who acquired such tobacco from the producer but an amount equivalent to the penalty may be deducted by the buyer from the price paid to the producer in case such tobacco is marketed by sale; or, if the tobacco is marketed by the producer through a warehouseman or other agent, such penalty shall be paid by such warehouseman or agent who may deduct an amount equivalent to the penalty from the price paid to the producer.... If any producer falsely identifies or fails to account for the disposition of any tobacco, an amount of tobacco equal to the normal yield of the number of acres harvested in excess of the farm-acreage allotment shall be deemed to have been marketed in excess of the marketing quota for the farm, and the penalty in respect thereof shall be paid and remitted by the producer...."
 
 
 37
 7 U.S.C. Sec. 1314(a). The government may collect the penalty from the acquirer or can proceed against the producer, but it is the producer against whom the penalty is imposed.
 
 
 38
 While the statute requires the buyer, agent or warehouseman to pay the penalty, it is clear that the imposition of the penalty is on the offending producer.
 
 
 39
 U.S. v. Whittle, 287 F.2d 638, 640 (4th Cir.1961).
 
 
 40
 The penalties charged against Cole were calculated by the Sec. 1314(a) measure, 75% of average market price.
 
 
 41
 The Secretary has adopted regulations that he contends authorize him to impose the Sec. 1314(a) penalty against a tobacco dealer based upon his failure to keep proper records of tobacco he has "resold."
 
 
 42
 (d) Dealer's tobacco. The ... tobacco resales by a dealer (as shown or due to be shown on Form MQ-79), which are in excess of his total prior ... tobacco purchases (as shown or due to be shown on From MQ-79) shall be considered to be a marketing of excess tobacco and penalty thereon shall be due at the time the marketing takes place which results in the excess....
 
 
 43
 (e) Resales not reported. Any resale of tobacco which is required to be reported by a warehouseman or dealer, but which is not so reported within the time and in the manner required, shall be considered to be a marketing of excess tobacco, unless and until such warehouseman or dealer furnishes a report of such resale which is acceptable to the State executive director. The penalty thereon shall be paid by the warehouseman or dealer who fails to make the report as required.
 
 
 44
 7 C.F.R. 725.94(d), (e) (1989 ed.); 726.88(d), (e) (1989 ed.) (emphasis added).[3]
 
 
 45
 The action taken by the Secretary against Cole is beyond his statutory authority for several reasons.
 
 
 46
 (1) By Sec. 1373 Congress has directly spoken to the failure of a tobacco dealer to maintain records and has assigned the consequences of that failure.
 
 
 47
 (2) The "regime" or "system" put in place by the Secretary to control sales of over-quota tobacco sweeps too broadly. The decision by this court has not even addressed this issue.
 
 
 48
 (3) Imposition of the Sec. 1314(a) penalty conflicts with Gold Kist, Inc. v. USDA, 741 F.2d 344 (11th Cir.1984).
 
 
 49
 (4) This court sustains the validity of regulations (d) and (e) on the ground that they merely create a rebuttable presumption that Cole has not shown to be irrational. Regulation (d), on which most of Cole's penalty is based, contains no right to rebut, and the presumption of regulation (e) is not rational.[4]
 
 
 50
 * * * * * *
 
 
 51
 (1) Preemption by Congress.
 
 
 52
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is the controlling case in judicial review of agency action. In Chevron the Supreme Court set forth a two-step test:
 
 
 53
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 54
 Id. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted). This court has ignored the first step of Chevron 's test. It assumes without discussion that Congress has authorized the Secretary to regulate the field of violations of record-keeping by dealers, or has remained silent as to it, and goes directly to the second step of whether agency action is reasonable.
 
 
 55
 It does not answer the Chevron first-level inquiry to say that the Secretary's regulations do not penalize the failure to keep records but rather penalize a purchaser in a transaction in which he has acquired over-quota tobacco from a producer. In Sec. 1373 Congress defined the consequence of an improper record--fines and a misdemeanor conviction. The Secretary, by regulation, has assigned different (and for Cole, catastrophic) consequences. I discuss below the validity of the presumptions on which the Secretary and this court rely. But at the first level, without reaching that inquiry, the Secretary's regulations are beyond his authority because they intrude on both subject matter and assigned consequences that Congress has preempted.
 
 
 56
 (2) The "regime" or "system" sweeps too broadly.
 
 
 57
 Assuming that the Secretary's "regime" does not fall at the first level of Chevron, it fails at the second level. It is unreasonable because it sweeps too broadly.
 
 
 58
 Congress has elected to regulate the marketing of over-quota tobacco through Sec. 1314(a) and the penalties for record-keeping failure by Sec. 1373(a). It has authorized the Secretary to promulgate regulations for enforcement of the Act. But that authority must be exercised in the light of Congress' specific elections under Sec. 1314(a) and Sec. 1373(a).
 
 
 59
 The Secretary has made no effort to bring himself within, or to act consistently with, Sec. 1373(a) but simply has ignored it. He has attempted to bring himself within Sec. 1314(a) by regulations defining in Sec. 1314(a) terms the events sought to be regulated and the participants in that event.
 
 
 60
 First, as to the participants: The target of regulations (d) and (e) is "a dealer." By regulation the Secretary has defined a dealer in tobacco as "[a] person who engages to any extent in acquiring or selling tobacco in the form normally marketed by producers." 7 C.F.R. 725.51(g). Of course, one who buys tobacco from a producer thereof is, in the language of Sec. 1314(a), a "person who acquire[s] such tobacco from the producer," and such an "acquirer" may be engaged, but is not necessarily engaged, in the business of buying and selling tobacco. The Secretary has chosen the dealer as the "throat" or point of contact at which the "regulatory regime" will operate to control against marketing by producers of over-quota tobacco.
 
 
 61
 Thus, the regulatory regime is designed to control against producers' marketing in excess of quotas by ensuring that dealers will account for all purchases and remit or collect the penalty amount which is appropriate.
 
 
 62
 Gov't.Brief, p. 8. The Secretary has the power to select the dealer as the control point. He can require the dealer to keep records, and Sec. 1373 prescribes a penalty for the dealer's failure to do so. But the issue before us concerns not power to select but the limits on power to impose a penalty. The act of designating the dealer as the point of contact for implementing control does not impose upon the dealer, as dealer, the obligations placed by Sec. 1314(a) upon one who acquires from a producer. A dealer is obligated to collect and remit only if he is a Sec. 1314(a) acquirer and then only to the extent of his acquisition.
 
 
 63
 Faced with the necessity of inferring a dealer's status [as acquirer] in a [presumed] purchase transaction--from the dealer's failure to keep records of a resale made at a later date--the Secretary states over and over again that the Act itself assigns to the dealer the responsibility to collect and remit the Sec. 1314(a) penalty for over-quota tobacco. E.g., Gov't.Brief, pp. 2, 15, 16, 22, 24, 25, 29, 33. These are misstatements. The Act assigns the responsibility to the Sec. 1314(a) acquirer. The dealer is responsible only if, and to the extent, he is a Sec. 1314(a) acquirer.
 
 
 64
 Second, with respect to the action or event sought to be regulated: The statutory marketing event is a producer-to-acquirer sale with a penalty collected from the acquirer. The event covered by the regulations takes place upon a coalescing of two occurrences--a resale by a dealer and a failure of the dealer to keep records--neither of which is addressed by Sec. 1314(a). These occurrences take place downstream from any producer-to-acquirer transaction, and any number of successive transactions and participants may intervene and be subject to the regulations. To bridge the gap between the Sec. 1314(a) event and the regulated event(s) the Secretary has promulgated in (d) a presumption springing from resales exceeding recorded purchases, and in (e) a presumption springing from unreported sales, each providing that the event "shall be considered to be a marketing of excess tobacco."
 
 
 65
 The Secretary, by applying regulations (d) and (e)--in charging the penalties to Cole, in Cole's administrative appeals, in the district court, and in this court--has not identified as over-quota tobacco any of the tobacco that is the subject of the penalties, nor has he identified the producer of any of the tobacco. He has not identified any producer-to-acquirer transaction participated in by Cole, or indeed any producer-to-acquirer transaction that has occurred. Nor has he brought forward evidence of whether any of the tobacco used as the basis for calculating the penalties against Cole has previously been the subject of a penalty arising from any producer-to-acquirer transaction as described in Sec. 1314(a). His position simply is that he need not do any of these things.
 
 
 66
 The sweep of the regulatory scheme may be seen by its impact. Application of it to a dealer establishes several things:
 
 
 67
 --That some one or more unidentified producers have sold to some one or more unidentified purchasers over-quota tobacco.
 
 
 68
 --That the penalties that should have been paid on one or more of those producer-to-acquirer transactions were not paid by the purchaser(s).
 
 
 69
 --That the penalties due for any of the [presumably] over-quota tobacco have not been paid by any downstream owner of any of the tobacco.
 
 
 70
 --That some or all of the [presumably] over-quota tobacco that was the subject matter of one or more producer-to-acquirer transactions has come into the hands of the dealer and has been resold by him.
 
 
 71
 --That all tobacco resales, the dealer's records of which do not comply with (d) or (e), are resales of over-quota tobacco that meet the foregoing conditions.
 
 
 72
 --That a recorded paper trail exists in the tobacco industry that in fact would reveal to a dealer who purchases tobacco but is not the purchaser in the underlying Sec. 1314(a) transactions that tobacco he is acquiring is over-quota tobacco on which no penalty has been paid.
 
 
 73
 The power of the Secretary to make regulations that enforce the Act does not sweep this broadly, whether done by creation of a presumption or otherwise.[5] It does not answer to say that (d) and (e) do not impose a penalty but only "supply evidence" that a dealer has engaged in a Sec. 1314(a) transaction involving over-quota tobacco. As I discuss below, regulation (d) operates directly to create a consequence--"a penalty thereon shall be due"--and provides no right to rebut. With respect to (e), describing it as "merely evidentiary" is but a play on words. It creates a consequence--"the penalty thereon shall be paid"--subject to a right to submit evidence that will satisfy the department. If this consequence is valid at all it is only to the extent the presumption is valid.
 
 
 74
 (3) Imposition of the Sec. 1314(a) penalty conflicts with Gold Kist
 
 
 75
 In Gold Kist, Inc. v. USDA, 741 F.2d 344 (11th Cir.1984), we distinguished between mere administrative sanctions and penalties, civil or criminal. We held that a statute must plainly establish a penal sanction in order for an agency to have authority to impose a penalty. At issue in the case was whether the USDA had authority to impose civil monetary penalties relating to marketing and handling peanuts. Under the peanut price support program in effect at the time, there were two categories of peanuts: "quota peanuts," those produced under a quota and allotment granted the farmer under the federal peanut program, and "additional peanuts," those grown in addition to a farmer's allotment and quota. While there existed specific statutory authority, 7 U.S.C. Sec. 1359(g)[6], for marketing penalties relating to "quota peanuts," similar statutory authority for marketing penalties relating to "additional peanuts" did not exist. The USDA argued that because of its general authority to regulate peanut marketing it had authority to set the conditions under which "additional peanuts" were handled and that this authority necessarily encompassed the power to assess monetary penalties.
 
 
 76
 We held: (1) that an agency may impose administrative sanctions not specifically imposed by statute so long as the penalty is reasonably related to the purposes of the enabling legislation; and (2) that an agency's power to impose penalties and penal statutes is to be strictly construed; and (3) that one is not to be subjected to a penalty unless the words of the statute plainly impose it. 741 F.2d at 348. We concluded that the penalties imposed on Gold Kist were invalid.
 
 
 77
 In Gold Kist the penalty imposed under the same marketing statute on a different classification of peanuts was held not to plainly impose a penalty on the classification of peanuts in question. In the present case, as I have pointed out, the Act does not plainly impose the Sec. 1314(a) penalty on a dealer except to the extent he has acquired from a producer, nor plainly impose it on his function as seller, nor upon a resale transaction. It does not plainly impose that penalty on transactions the subject matter of which is not shown to be over-quota tobacco and the source of which is not shown to be a producer, nor upon a transaction involving tobacco with respect to which it is not known whether a producer-to-acquirer penalty has already been paid. And, last, the statute does not plainly impose the Sec. 1314(a) penalty upon failure to keep records.
 
 
 78
 The Secretary concedes that there is no express authorization for regulations (d) and (e).
 
 
 79
 [E]ven though there is no express authorization in the Act for the regulations challenged in this case, the regulations plainly honor the provisions of the Act, and achieve a result in accord with the statutory scheme. Accordingly, the regulations must be sustained by this Court.
 
 
 80
 Gov't.Brief, p. 29 (emphasis added). If the statute does not authorize the regulations it does not authorize imposition of a penalty based on those regulations. It would stand Gold Kist on its head to hold that regulations not specifically authorized by statute can serve to make specific a statutory penalty that is not plain and specific.[7]
 
 
 81
 Gold Kist fits into the Chevron analysis. The first step in Chevron 's two-part inquiry requires a reviewing court to determine whether Congress had a clear intent as to a particular matter. The Supreme Court said that "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. Gold Kist provides us a tool of statutory construction: penal statutes are strictly construed; the imposition of a penalty requires that the words of the statute plainly impose it. As I have set out, the words of this statute do not plainly impose the Sec. 1314(a) penalty on a dealer in Cole's position.
 
 
 82
 This court holds that Gold Kist is inapplicable because a presumption is involved. The presumption is created by regulation, not by the statute. If that interpretation is accepted an agency can expand its power over areas it can regulate simply by presuming that things or events it wants to have power to regulate constitute something the agency does have power to regulate. An agency may not give itself "clear congressional authorization" to act in or regulate an area simply by presuming that things outside its authority constitute things within its authority.
 
 
 83
 (4) The failure of the presumption
 
 
 84
 The Secretary has attempted to cabin analysis to a single question:
 
 
 85
 Whether the Agricultural Adjustment Act of 1938 permits the Secretary of Agriculture to promulgate regulations which creates [sic] a rebuttable presumption that a dealer in tobacco has participated in marketing in excess of marketing quotas, where the dealer has failed to report the source of tobacco sold and the dealer has sold more tobacco than reported purchased.
 
 
 86
 Gov't.Brief, p. 2. This court has accepted that argument and, disregarding other issues, decides that penalties against Cole are valid because Cole has not shown that the presumption is irrational. As I have spelled out, this case is neither so narrow nor so easy.
 
 
 87
 Turning, however, to the presumption issue I have already pointed out that (d) contains no provision for rebuttal. It unequivocally defines the consequences of a failure to keep records. To create a right to rebut in (d) this court has relied upon the principle of an agency's interpreting its own regulation and the Secretary's willingness in this instance to accept from Cole rebuttal evidence that tobacco he resold was not over-quota. But the issue before us is not validity of (d) as applied; it is whether (d) as enacted is beyond the authority of the Secretary. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), and Martin v. Occupational Safety and Health Rev. Comm'n, 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991), involved administrative interpretation of ambiguous regulations where the meaning of words used in the regulations was in doubt. Regulation (d) is not ambiguous and contains no reference to a right to rebut. The Secretary's sole ground for sustaining (d) is its alleged rebuttable presumption. Since (d) contains no presumption and no right to rebut, if Cole is not entitled to 100% relief he is at least entitled to relief from penalties assessed under (d).
 
 
 88
 The presumption of (e) places on Cole both the burden of coming forward with evidence and the burden of persuasion. Undergirding all presumptions are judicial assessments of probabilities or likelihood that permit inferences to be drawn without proof in the usual sense. I have set out in (2) the elements that necessarily must be accepted without proof in Cole's case. They are too sweeping and too far from the necessary elements of proof to be intuitively rational. Moreover, with respect to probabilities or likelihood, we do not know whether as a general proposition the paper trail system that was in place when this case began was being complied with and would have revealed the information that this court says was available. We do know that the system in place when this case began has been revamped. Also, we do not know how much over-quota tobacco was in the stream of tobacco marketing, whether 10% or 80% of the total; if hypothetically 10% was over-quota there is little likelihood that sales made by Cole and not recorded were in fact over-quota tobacco.
 
 
 89
 This court's justifications for the validity of the presumption are in large part circular. To the question whether it is irrational to presume that tobacco sold by a dealer without proper record is over-quota tobacco, the court answers that this fact is presumed. (P. ----.) To the point that a dealer resale may not validly be presumed to evidence a producer-to-acquirer sale, the court responds that the presumption answers that problem. (P. ----.) The rationality of a presumption cannot be established by the fact of its existence. Finally, the court relies upon its view that there is nothing intuitively irrational about the presumption and, as support, gives a hypothetical involving collusion between an over-quota producer and a fraudulent acquirer.
 
 
 90
 The district court gave this case a decent burial. I would leave it there.
 
 
 
 [1]
 The parties agree that the regulations found in the 1989 edition of the Code of Federal Regulations were applicable at all times relevant to this case. The regulatory scheme has subsequently been changed, although the presumptions at issue in this case are still contained in the regulations. See 7 C.F.R. Sec. 723.410 (1993 ed.)
 
 
 [2]
 See generally 7 C.F.R. Secs. 725.87, 725.98-.100 (1989 ed.)
 
 
 [3]
 The quoted regulations apply to flue-cured tobacco, one of the two types of tobacco at issue in this case. Substantively identical regulations apply to burley tobacco, the second type of tobacco involved. 7 C.F.R. Sec. 726.88 (1989 ed.)
 
 
 [4]
 We note that the language of 7 C.F.R. Sec. 729.94(e) is couched in terms of a rebuttable presumption. On the other hand, we note that 7 C.F.R. Sec. 725.94(d) is not; its language does not expressly provide for an opportunity to rebut. However, as noted in text, Cole acknowledges that a presumption is created. Moreover, it is clear from the administrative proceedings in this case that the government has consistently treated the presumption as rebuttable. See, e.g., Transcript of Proceedings, In the Matter of Civil Penalties Assessed Against Peachtree Tobacco Co. for Excess Marketing (June 20, 1990), at 4 (Admin.R. 60) (stating that penalties would be assessed against Cole "unless he furnishes satisfactory proof that these were not excess resales"); see also Letter from Samuel F. Brewer to Graham L. Cole, June 1, 1989 (Admin.R. 246); Letter from Ralph T. Hudgens to Graham L. Cole (undated) (Admin.R. 193); Letter from Ralph T. Hudgens to Graham L. Cole, March 6, 1990 (Admin.R. 157) (all stating that Cole may contest the penalty by furnishing proof that the excess poundage was not over-quota tobacco). An agency's interpretation of its own regulations is controlling unless it is plainly erroneous or inconsistent with the regulation. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); see also Martin v. Occupational Safety & Health Rev. Comm'n, 499 U.S. 144, 156, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991) (indicating that an agency's interpretation of regulations taken during an administrative proceeding is not a "post hoc rationalization" and is entitled to deference)
 
 
 [5]
 Cole makes no argument that there is a lack of statutory authority for a penalty to be collected from him upon proof that he purchased over-quota tobacco from a producer. Indeed, Cole could hardly make such an argument in the face of the plain language of the statute, which provides that any person (clearly including a dealer like Cole) who purchases such over-quota tobacco shall pay the penalty
 
 
 [6]
 Cole points to United States v. Whittle, 287 F.2d 638 (4th Cir.1961), to support his argument that the Section 1314(a) penalty is levied against the producer. The Whittle court held that ultimate liability for the penalty did fall on the producer. Apparently rejecting an argument that the government could proceed only against the dealer, the court held that the government could collect the penalty directly from the producer in order to avoid "an unnecessary circuity in the collection of the penalty." Id. at 640. Nothing in Whittle suggests that the government could not also have exercised its option to collect the penalty from the dealer; indeed, any such holding would have contradicted the plain language of the statute. As noted above, the statute expressly provides for collection of the penalty from the dealer-purchaser, leaving the dealer free to recover the amount of the penalty from the producer if he so chooses. If Cole is unable to rebut the presumption that he entered into the purchase of excess tobacco from a producer, he must pay the Section 1314(a) penalty, but then may recover that amount from the producer with whom he entered the unauthorized transaction. This is exactly the process that the statute anticipates
 
 
 [7]
 Cole relies on Gold Kist, Inc. v. USDA, 741 F.2d 344 (11th Cir.1984), to support his contention that the penalties imposed by administrative agency regulations must be expressly authorized by statute. However, this case is unlike Gold Kist. In that case, the position of the USDA was that it had "inherent authority to impose money penalties" without the necessity of express statutory authority. Id. at 345. The USDA argued that the mere existence of a regulatory scheme regarding peanuts was sufficient to authorize penalties which were not specifically provided for by statute. Rejecting the USDA position, this court held that a "statute must plainly establish a penal sanction in order for the agency to have authority to impose a penalty." Id. at 348. Gold Kist did not involve regulatory presumptions. By contrast, in this case, the USDA does not attempt to justify the penalties assessed against Cole by mere reference to the regulatory scheme regarding tobacco, or by invoking its inherent authority. Rather, the government points out that the penalties are precisely those authorized by Section 1314(a), and that it has established the precise event upon which the statute imposes a penalty by inferring same from proof of the predicate fact. In other words, this case is different from Gold Kist because in this case, through operation of the presumption, the precise fact upon which the statute imposes a penalty is presumed from demonstration of predicate facts. Thus, as discussed in text, the issue in this case is the validity and rationality of the regulatory presumption
 
 
 [8]
 Cole implicitly argues that the fact that event A (the sale by producer to dealer) and event B (the resale by dealer) occur at different stages somehow indicates that the two events are totally unrelated. However, the fact that the two events involve different stages of the marketing process says little or nothing with respect to whether or not there is a rational nexus between the two events, and it certainly does not demonstrate or carry Cole's burden of demonstrating that there is no rational connection at all. Moreover, as noted in the text, the two events do occur in immediately succeeding stages of the same marketing process. Also, the two events are tied together as indicated below by the record and reporting requirements of the regulatory framework
 
 
 [9]
 Under the regulatory framework, an innocent dealer would examine the producer's marketing card and it would be immediately apparent that 2,000 pounds were over-quota
 
 
 [10]
 The reason for the presumption is also apparent. Because of the collusion between the producer and dealer in the hypothetical, it would be difficult for the government to trace and identify the producer who initially sold the over-quota tobacco
 
 
 [11]
 Cole suggests that he could have purchased tobacco from a warehouse or another dealer, rather than from a producer, and thus such a purchase would not implicate over-quota tobacco subject to a penalty. However, Cole's purchases from a warehouse or another dealer, like all other purchases of tobacco, are required by regulation to be recorded and reported. Accordingly, the regulatory framework provides a ready means for Cole to rebut the presumption that he has purchased over-quota tobacco from a producer
 
 
 [12]
 We recognize that Cole claims his violations of the regulations stem from fraud perpetrated upon him by a third party using his dealer card. While this type of conduct may or may not be sufficient to rebut the presumption, it is not relevant to the issue now before us. There also is no argument on appeal that the regulation is unreasonable because it does not afford sufficient scope for a dealer's rebuttal of the presumption, or that the USDA has been arbitrary in declining to credit his excuses. Thus, for example, we do not have before us a case in which the USDA would not entertain rebuttal of a presumption when a dealer's records were destroyed by fire
 
 
 [1]
 Pub.L. No. 430, 52 Stat. 31, Sec. 311(a), codified, as amended, as 7 U.S.C. Sec. 1311 et seq
 
 
 [2]
 7 U.S.C. Sec. 1375 Regulations:
 (a) The Secretary shall provide by regulations for the identification, wherever necessary, of corn, wheat, cotton, rice, peanuts, or tobacco so as to afford aid in discovering and identifying such amounts of the commodities as are subject to and such amounts thereof as are not subject to marketing restrictions in effect under this subchapter.
 (b) The Secretary shall prescribe such regulations as are necessary for the enforcement of this subchapter.
 
 
 [3]
 It is worth noting that neither regulation mentions Sec. 1314(a) but only "penalty" and "the penalty thereon."
 
 
 [4]
 The penalty was imposed for two different types of tobacco, flue-cured and burley, and for three different marketing years:
 -1985-86--penalty of $682.72 assessed for excess marketing of flue-cured tobacco based on 7 C.F.R. Sec. 725.94(d).
 -1986-87--penalty of $28,033.20 assessed for excess marketing of burley tobacco based on 7 C.F.R. Sec. 726.88(d) and (e); and penalty of $318,163.02 assessed for excess marketing of flue-cured tobacco based on C.F.R. Sec. 725.94(d).
 -1987-88--penalty of $51,877.65 assessed for excess marketing flue-cured tobacco. It is unclear whether this penalty was based on 7 C.F.R. Sec. 725.94(d) or (e) or both.
 
 
 [5]
 The impact of the regulatory scheme is accented by Cole's contention that his failures of record-keeping arose from fraud perpetrated upon him by a third party using his dealer cards. This court, n. 12, says this is irrelevant and leaves open whether proof of fraud can rebut the presumption
 
 
 [6]
 7 U.S.C. Sec. 1359(g) provided, in relevant part:
 Upon a finding by the Secretary that the peanuts marketed from any crop for domestic edible use by a handler are larger in quantity or higher in grade or quality than the peanuts that could reasonably be produced from the quantity of peanuts having the grade, kernel content, and quality of the quota peanuts acquired by such handler from such crop for such marketing, such handler shall be subject to a penalty equal to 120 per centum of the loan level for quota peanuts on the peanuts which the Secretary determines are in excess of the quantity, grade, or quality of the peanuts that could reasonably have been produced from the peanuts so acquired.
 
 
 [7]
 The above concession by the Secretary confirms what is evident--that nothing in the statute indicates an intent by Congress to trigger penalties by looking to resales downstream from the producer-to-acquirer transaction